Howard F. Rowland v. Commissioner.
Rowland v. Commissioner
Docket No. 59534.
United States Tax Court
T.C. Memo 1958-98; 1958 Tax Ct. Memo LEXIS 133; 17 T.C.M. (CCH) 500; T.C.M. (RIA) 58098; May 27, 1958
*133 Petitioner was the beneficial owner of all shares of stock of a close corporation. Upon learning that another individual wanted to purchase certain assets then being used by his corporation, he decided that such assets should be sold by him in his individual capacity, after liquidation of the corporation, rather than by the corporation itself. This decision was based on advice given to him by his certified public accountant that such procedure should be followed in order to prevent imposition of a corporate capital gains tax. Petitioner thereupon entered into a contract for sale of the assets, in his individual capacity. The corporation was then liquidated and dissolved; and following this, petitioner, in his individual capacity, executed and delivered a bill of sale of the assets to the purchaser, and received, in his individual capacity, the initial payment of the purchase price. Held, that the sale of assets was made by petitioner in his individual capacity, following a genuine liquidation of the corporation; and that no such sale was made by the corporation itself. United States v. Cumberland Public Service Co., (1950) 338 U.S. 451, followed. J. J. Thyson, *134 Esq., for the petitioner. William H. Welch, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined a liability against petitioner, as transferee of Rowland Mortuary Service, Inc., a dissolved corporation, in respect of an unpaid deficiency in said corporation's income tax for its final taxable period extending from January 1 to August 31, 1951, in the amount of $5,747.65, together with interest thereon. The sole issue for decision is whether a sale of assets theretofore used by the mortuary corporation in its business, actually was made by the corporation; or whether such sale was made by the stockholder who beneficially held all the shares, after said assets had been distributed to him in liquidation of the corporation. Findings of Fact The petitioner, Howard F. Rowland, is a resident of St. Louis, Missouri. He was the beneficial owner of all the shares of Rowland Mortuary Service, Inc., a Missouri corporation, from the time of its incorporation on January 1, 1949, to the time of its dissolution on August 31, 1951. Said corporation filed its income tax return for its final taxable period with the collector *135 of internal revenue for the first district of Missouri. Petitioner, for several years prior to 1949, had operated a mortuary business in St. Louis, as a sole proprietorship; and in 1949 he had incorporated this business pursuant to the laws of the State of Missouri, under the name of Rowland Mortuary Service, Inc. The capital stock of the corporation consisted of 100 shares of common stock, of which 98 shares were issued in the name of petitioner; 1 share was issued to petitioner's brother and attorney, Claude K. Rowland; and 1 share was issued to petitioner's certified public accountant, Bruce Gillies. The 2 shares issued to Claude and Gillies had been endorsed over to petitioner, so that he was the sole owner of the corporation. Petitioner was the president of the corporation; Claude was an officer - apparently vice-president; and Gillies was the secretary. On July 27, 1951, petitioner went to the office of Gillies and told the latter that an individual named Donald Aker had indicated a desire to purchase the mortuary business which the corporation was operating. Petitioner indicated to Gillies that he was reluctant to sell his interest in the business because it was his only *136 source of income; and also because he was concerned as to whether the proceeds of such a sale would be sufficient, after taxes, to enable him to liquidate his liabilities and also to buy a new home to replace his existing residence in the building occupied by the mortuary. Gillies advised petitioner that it would make a material difference in the amount of tax to be paid, whether the assets were sold by the corporation as such, or by petitioner individually after the corporation had been liquidated. He also strongly advised petitioner that, if any sale of the assets were to be made, it should be made by petitioner individually, after liquidation of the corporation, and not by the corporation itself; that in all his dealings he should act as an individual, and all agreements should be executed by him as an individual; and that all earnest money and other payments should be received by him individually, and should be deposited in his personal bank account. Gillies thereupon agreed to bring the accounts of the corporation up to date, and to determine what the amount of the tax liability would be on a sale of the assets by petitioner individually, as distinguished from a sale by the corporation. *137 On August 8, 1951, Gillies, after having brought the corporation records up to date and having computed the amount of the potential tax burden, went to petitioner's office and there further discussed with him the matter of selling the business. He told petitioner that, based on the computations which he had made and based also on an assumption that the assets would be sold by petitioner individually after liquidation, it would be necessary for him to sell such assets at a price of $35,000, if he were to accomplish his above-mentioned objectives. Gillies then suggested that petitioner talk with Aker and determine whether the latter would pay such price. Shortly thereafter, Gillies received a telephone call from petitioner, indicating that Aker was willing to pay the $35,000; and thereupon, on or about August 10, 1951, Gillies informed Claude, as one of the officers of the corporation, of the plan which he and petitioner had formulated for handling the transaction. On August 14, 1951, petitioner and Claude went to the office of Aker's lawyer, Alfred Kerth of Clayton, Missouri, for the purpose of closing the sale transaction. Kerth there submitted to them a written offer to purchase *138 that he had prepared, which was addressed to "Mr. Howard Rowland and Rowland Mortuary Service, Inc.," and which also provided at the end thereof for acceptance and approval by "Howard Roland [Rowland] and Rowland Mortuary Service, Inc., By , President." Claude, upon observing these two quoted features, objected thereto on the ground that the arrangement was for the assets to be sold by petitioner individually and not by the corporation. Thereupon, in the presence of Claude, either Kerth or someone else drew a pen-line through the words "Howard Roland [Rowland] and Rowland Mortuary Service, Inc., "and the word "President," as the same appeared in the acceptance clause. [1] Thereupon the offer, as so amended, was accepted and approved by petitioner individually on the date of August 14, 1951, which it bears. *139 A copy of the original offer and acceptance, as received in evidence, is as follows: "Clayton, Missouri
August 14, 1951 "Mr. Howard Rowland and Rowland Mortuary Service, Inc., 4104 Manchester Avenue, St. Louis, Missouri
"Gentlemen: "Confirming our several negotiations over my purchase of the business known as Rowland Mortuary Service, Inc., I make this offer for the purchase of the business, including the name and good will. It is our understanding as follows: "Subject to the verification of the assets of the Company it is agreed that I will pay $35,000.00 for the purchase of the business, payable as follows: "1. The sum of $20,000.00 cash on closing of the transaction. "2. The balance of $15,000.00 shall be payable at the time that I sell my home, but in no event later than six months from the date of closing. Interest on the unpaid balance shall be payable at the rate of 5% per annum for the outstanding time. "3. I shall also assume and pay the balance of the purchase price owing on account of two 1951 Cadillac hearses. "You will retain all accounts receivable and provide for the payment of all accounts payable of said business. You will also comply with the *140 terms of the Bulk Sales Law of the State of Missouri. Upon the consummation of sale I shall [have the right to] * enter into a lease of the entire premises at 4104 Manchester Avenue, St. Louis, Missouri, occupied by the business at the rental of $350.00 per month for the entire building, said lease to be on the usual commercial form of lease for a term of five years, with an option to renew for an additional period of five years at the same rental. "This transaction shall be closed on or before September 1, 1951, and upon closing same I shall have the right to take immediate possession. "Your acknowledgment hereunder shall constitute a contract after which time I will take steps to have proper legal papers prepared for final closing of this transaction. "Very truly yours, "(Signed) Donald Aker "ACCEPTED AND APPROVED this 14 day of August, 1951 "[HOWARD ROLAND] * [ROWLAND] [AND ROLAND MORTUARY SERVICE, INC.] * By (Signed Howard F. Rowland [PRESIDENT] * " On August 16, 1951, petitioner received $1,000 from Aker, as earnest money and part purchase money in respect of the transaction; and he thereupon delivered to Aker *141 a receipt for the same which was signed by him only, as "Howard F. Rowland." On August 22, 1951, a special meeting of the stockholders of Rowland Mortuary Service, Inc., was held, of which the following are the minutes: "There were present, in person: "Howard F. Rowland, holding 98 shares Claude K. Rowland, holding 1 share, and Bruce Gilles [Gillies], holding 1 share "The following resolution was unanimously adopted: "RESOLVED, that the corporation dissolve forthwith and that its affairs be wound up in the manner provided by 'The General and Business Corporation Act of Missouri.' "RESOLVED FURTHER, that all liabilities of the corporation be paid and discharged and that all remaining assets of the corporation be distributed ratably among the stockholders in proportion to the number of shares respectively held by them, in complete redemption and cancellation of the capital stock outstanding. "RESOLVED FURTHER, that the officers be, and they hereby are, authorized and directed to prepare and file Articles of Dissolution and to execute any other documents necessary, properly to wind up the affairs of the corporation and terminate its existence. "There being no further *142 business, the meeting then adjourned. "(Signed) Howard F. Rowland President "ATTEST: "(Signed) J. Bruce Gillies Secretary" Articles of Dissolution and Articles of Liquidation were thereupon duly signed, verified, and filed in the office of the Secretary of State of the State of Missouri; and a Certificate of Dissolution was issued by the Secretary of State on August 31, 1951. On the same date of August 31, 1951, petitioner in his individual capacity executed a "Bill of Sale of Personal Property," in which it was provided in substance: "That Howard F. Rowland sold to Donald Aker all of the physical properties 'heretofore used by' the Rowland Mortuary Service, Inc., in the conduct of its business, together with all the good will of the business and the right to operate such business under the name of 'Rowland Mortuary Service'; "That petitioner thereby agreed that he would not, directly or indirectly, engage in any competitive business in the vicinity of St. Louis, for a specified period; and "That petitioner warranted, 'that I am the owner thereof, and have full right and title thereto, and authority to sell and dispose of the same, and that the above described property *143 is now free and clear of all liens and encumbrances of every kind'." This bill of sale bore the acknowledgment, under oath, by petitioner individually. Petitioner, on his individual income tax return for the year 1951, reported that he had received capital gain on the liquidation of the Rowland Mortuary Service, Inc.; but he reported no gain on the sale of assets to Aker, on the ground that such assets were sold for an amount equal to his basis, which was the value of the assets at the time he received them in liquidation of the corporation. The corporation, in its final income tax return, reported that it had been liquidated, and it made no mention of any sale of its assets. Respondent, in his notice of transferee liability to petitioner, determined that the sale of assets to Aker was made by the corporation, and that petitioner was liable as a transferee of the corporation for an unpaid deficiency in its income taxes resulting from such a sale. Prior to the issuance of said notice, petitioner executed and delivered to respondent an agreement in which he assumed and agreed to pay the amount "of any and all Federal income, excess profits, or profits taxes finally determined" *144 to be due and payable by Rowland Mortuary Service, Inc. The sale of the assets formerly used by Rowland Mortuary Service, Inc., was made by Howard F. Rowland in his individual capacity following a genuine liquidation and distribution to him of such assets by the corporation; and no such sale was made by the corporation itself. Opinion The issue here presented, as above indicated, is whether a sale of certain assets formerly employed by a corporation now dissolved, actually was made by the corporation itself - so as to cause it to be taxed on capital gains resulting from the sale; or whether the sale was made by the petitioner, who beneficially owned all shares of the corporation, following distribution of the assets to him as part of a genuine liquidation - so that no gain from the sale is chargeable to the corporation. This question is practically identical with that considered by the Supreme Court in , affirming (Ct. Cls.) . The facts of the Cumberland case may be summarized as follows. The taxpayer, a closely held public utility corporation, engaged in generating *145 and distributing electric power, was faced with severe competition from a cooperative which was distributing Tennessee Valley Authority power in the area. The taxpayer's shareholders, realizing that the corporation would have to get out of the power business, offered initially to sell their stock to the cooperative. The cooperative refused to buy the stock, but countered with an offer to buy the taxpayer corporation's transmission and distribution equipment. The corporation, after receiving advice from its accountant, rejected this offer because such a sale would subject it to a heavy capital gains tax. At the same time the shareholders, desiring to save payment of the corporate gains tax, offered to acquire the transmission and distribution equipment, and then sell the same to the cooperative. The cooperative accepted; and the shareholders thereupon entered into a written agreement to sell the assets to be so acquired by them. More than 2 months later at a special meeting of the shareholders, a resolution was adopted to liquidate and dissolve the corporation; and following this, the corporation transferred its transmission and distribution equipment to the shareholders in partial *146 liquidation, sold its remaining assets, and dissolved. The shareholders then consummated the previously arranged sale to the cooperative. Upon this sale by the Cumberland shareholders, the Commissioner assessed and collected a tax from the corporation, on the theory that the shareholders had been used as a mere conduit for effectuating what was really a corporate sale. The Court of Claims, in an action by the corporation to recover such tax, found as a fact that the sale had been made by the shareholders rather than the corporation; and it entered judgment accordingly. The Supreme Court, in affirming the Court of Claims, said: "While the distinction between sales by a corporation as compared with distribution in kind followed by shareholder sales may be particularly shadowy and artificial when the corporation is closely held, Congress has chosen to recognize such a distinction for tax purposes. * * * Consequently, a corporation may liquidate or dissolve without subjecting itself to the corporate gains tax, even though a primary motive is to avoid the burden of corporate taxation. "* * * Whatever the motive and however relevant it may be in determining whether the transaction *147 was real or a sham, sales of physical properties by shareholders following a genuine liquidation distribution cannot be attributed to the corporation for tax purposes. "The oddities in tax consequences that emerge from the tax provisions here controlling appear to be inherent in the present tax pattern. * * * "Congress having determined that different tax consequences shall flow from different methods by which the shareholders of a closely held corporation may dispose of corporate property, we accept its mandate. It is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs. * * *" The Supreme Court, in its above-mentioned opinion, distinguished its prior decision in . It stated that such prior decision rested on findings of fact made by the Tax Court to the effect that the sale had been made and the gains had been realized by the taxpayer corporation. Also it pointed out that such findings of fact had support in the evidence, for the corporation had negotiated the sale, reached an oral agreement of sale, and accepted part payment *148 of the purchase price - all before the tax consequences had been belatedly realized and before the corporation had attempted to "call off" the sale and distribute the assets to its shareholders so that they could carry out the previously arranged transaction. In a footnote appended to its opinion in the Cumberland case, the Supreme Court stated: "What we said in the Court Holding Co. case was an approval of the action of the Tax Court in looking beyond the papers executed by the corporation and shareholders in order to determine whether the sale there had actually been made by the corporation. We were but emphasizing the established principle that in resolving such questions as who made a sale, factfinding tribunals in tax cases can consider motives, intent, and conduct in addition to what appears in written instruments used by parties to control rights as among themselves. * * *" In the instant case it is our opinion that the facts here presented are indistinguishable, in substance, from those in the Cumberland case. Here also, a controlling stockholder (the petitioner), desiring to sell certain assets then being used by his corporation and desiring also to save payment of a *149 corporate capital gains tax, agreed to sell, in his individual capacity, such assets, which he as the controlling stockholder was in a position to obtain through liquidation. This method of sale had been previously decided upon, following recommendations which had been made to him by his certified public accountant and which also had been communicated to the only other officer of the corporation. This agreement was made effective by a written offer and acceptance which, prior to its execution, was specifically amended so as to make clear that the sale was being made by the stockholder (the petitioner), and not by the corporation. Thereafter the corporation was genuinely liquidated and dissolved; the stockholder in his individual capacity executed and delivered a bill of sale for the assets to the purchaser; and the stockholder, also in his individual capacity, received the initial payment for the assets. No previous agreement for sale of the assets was made by or on behalf of the corporation; no payment in respect of any such sale was ever accepted by the corporation; and there is no evidence that the transaction was a sham, or anything other than a true sale by the stockholder. *150 Based on our examination of all the facts and circumstances, we have hereinbefore found as a fact, and we here hold, that the sale of assets here involved was made by the petitioner in his individual capacity, following a genuine liquidation of the corporation; and that no such sale was made by the corporation itself. On authority of the Cumberland case, supra, we decide the present issue in favor of the petitioner. Decision will be entered for the petitioner. Footnotes
1. Claude K. Rowland testified that it was his impression that, at the same time, a pen-line had also been drawn through the words "Rowland Mortuary Service, Inc.," as they appeared in the address portion of the offer; but such amendment does not appear in the copy of the offer which was received in evidence. Claude further stated in his testimony that, if such amendment was not made on the original, it was due to oversight.↩
*. Bracket material was stricken. - CCH.↩